SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

## D.T. v. Archdiocese of Philadelphia (A-35-23) (088966)

**Argued October 7, 2024 -- Decided February 4, 2025**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court considers whether New Jersey courts may exercise personal jurisdiction over the Archdiocese of Philadelphia based on the alleged sexual abuse of plaintiff D.T. by defendant Michael J. McCarthy, a priest assigned by the Archdiocese to a Pennsylvania parish, during an overnight trip to a private home in New Jersey.

The Archdiocese maintains its principal office in Philadelphia and operates parishes, schools, and other facilities in five counties located in Pennsylvania. During jurisdictional discovery, the Archdiocese represented that it previously owned property in New Jersey but that it neither owns property nor conducts business in New Jersey today. A witness for the Archdiocese testified that priests in the Archdiocese are supervised by the Archbishop of Philadelphia, who determines where they live and work, and that, over the years, Archdiocese priests have sometimes accompanied parishioners traveling outside of the geographical boundaries of the Archdiocese, including attendance at a canonization ceremony in Rome, trips to World Youth Day, and camping trips sponsored by the Archdiocese.

McCarthy was ordained as a priest in 1965. He testified that, at the times relevant to this appeal, his primary responsibility was to teach at a high school, but he would work at the Pennsylvania parish D.T.'s family attended on holidays and weekends. McCarthy testified that for decades, his family vacationed in the shore community of Margate, where two of his relatives owned homes. He stated that he occasionally visited those relatives in Margate.

D.T., now a resident of Illinois, was born in 1957. D.T. testified that in the wake of his father's death, McCarthy urged his mother to let him serve as a mentor to the boy, and that his mother trusted McCarthy because he was a priest. According to D.T., McCarthy suggested to his mother that he take D.T. to the shore and D.T.'s mother agreed. D.T. alleges that, during that overnight trip, McCarthy sexually assaulted him.

1

At his deposition, McCarthy admitted that he was a friend of D.T.'s family and testified that he spent time with D.T.'s mother after D.T.'s father's death. He denied taking D.T. to Margate and denied sexually assaulting him. According to McCarthy, he did not have to ask the Archdiocese's permission or notify the Archdiocese before going to Margate. As to whether he had an obligation to notify the Archdiocese that he was taking children of family friends to Margate, McCarthy explained that the Archdiocese "never stopped us from going as priests back and forth. We didn't especially ask for permission there." D.T. does not contend that the Archdiocese knew, prior to his allegations in this matter, that McCarthy took him to Margate in 1971 and sexually assaulted him.

In May 2019, the Legislature enacted the New Jersey Child Victims Act, which, for a two-year period, reopened the statute of limitations for certain time-barred civil claims arising from sexual offenses committed against minors. In May 2020, D.T. filed this action against the Archdiocese and McCarthy. Pursuant to Rule 4:6-2(b), the Archdiocese moved to dismiss D.T.'s complaint for lack of personal jurisdiction. The trial court granted the Archdiocese's motion; the Appellate Division twice remanded the case for jurisdictional discovery and for consideration of the Archdiocese's past ownership of property in New Jersey. After the second remand, the trial court again granted the motion to dismiss. The Appellate Division affirmed, finding no basis for personal jurisdiction. 477 N.J. Super. 370, 389 (App. Div. 2023). The Court granted leave to appeal. 257 N.J. 5 (2024).

**HELD:** D.T. has not demonstrated that the Archdiocese's exercise of supervisory authority over McCarthy gave rise to the minimum contacts between the Archdiocese and New Jersey that would be necessary to exercise specific jurisdiction under Fourteenth Amendment due process principles in the setting of this appeal.

1. Rule 4:4-4(b)(1) authorizes a New Jersey court to exercise personal jurisdiction to the outer limits permitted by the United States Constitution. When a nonresident defendant challenges personal jurisdiction, the plaintiff bears the burden to demonstrate that the exercise of personal jurisdiction over that defendant would comport with due process principles, and New Jersey courts look for guidance in applying those principles to United States Supreme Court jurisprudence. Here, D.T. asserts that New Jersey may exercise specific jurisdiction over the Archdiocese. Specific jurisdiction is "founded . . . on an idea of reciprocity between a defendant and a State: When (but only when) a company exercises the privilege of conducting activities within a state -- thus enjoying the benefits and protection of its laws -- the State may hold the company to account for related misconduct." Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 360 (2021) (quotations and alterations omitted). The minimum contacts required to establish specific "jurisdiction often go by the name 'purposeful availment'" -- the defendant "must take 'some act by which

[it] purposefully avails itself of the privilege of conducting activities within the forum State.'" Id. at 359.  Further, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Bristol-Myers Squibb Co. v. Superior Ct., 582 U.S. 255, 262 (2017) (quotation omitted). The Supreme Court's jurisprudence rejects jurisdictional rules "based on general notions of fairness and foreseeability" as "inconsistent with the premises of lawful judicial power." J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 883 (2011). Accordingly, "the minimum contacts inquiry must focus on 'the relationship among the defendant, the forum, and the litigation.'" Lebel v. Everglades Marina, Inc., 115 N.J. 317, 323 (1989).  (pp. 15-21)

2.  Here, D.T. contends that because McCarthy's status as a priest facilitated his alleged sexual assault of D.T. in New Jersey, McCarthy was the Archdiocese's agent when he traveled to New Jersey, and the Archdiocese is subject to specific jurisdiction in New Jersey courts.  The United States Supreme Court has recognized that agency principles may play a role in the determination whether a nonresident defendant is subject to specific jurisdiction, but it has not suggested that agency principles governing the question of a principal's liability for the acts of an agent displace the minimum contacts due process analysis in a personal jurisdiction inquiry; instead, it reiterated the minimum contacts standard for specific jurisdiction. Daimler AG v. Bauman, 571 U.S. 117, 132-34 (2014).  Accordingly, if the Archdiocese did not establish minimum contacts with New Jersey that are relevant to this case, either directly or through an agent, agency principles do not support D.T.'s jurisdictional argument.  (pp. 21-24)

3.  Here, the Archdiocese did not establish such contacts with New Jersey.  If D.T.'s allegations are true, it was McCarthy, not the Archdiocese, who initiated and maintained contacts with New Jersey that are relevant to this case.  It was McCarthy, not the Archdiocese, who was responsible for access and travel to the private home in Margate.  There is no evidence that any Archdiocese representative was aware of McCarthy's impending trip, let alone that it assigned McCarthy to take D.T. to New Jersey.  There is no evidence that McCarthy conducted business on behalf of the Archdiocese in New Jersey, or that the trip entailed any religious or ecclesiastical activities.  D.T. has not demonstrated that the Archdiocese's exercise of supervisory authority over McCarthy gave rise to minimum contacts between the Archdiocese and New Jersey that relate to this action.  (pp. 24-26)

**AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE PATTERSON's opinion.**

3

SUPREME COURT OF NEW JERSEY
A-35 September Term 2023
088966

D.T.,

Plaintiff-Appellant,

v.

Archdiocese of Philadelphia
and Michael J. McCarthy,

Defendants-Respondents.

On appeal from the Superior Court,
Appellate Division, whose opinion is reported at
477 N.J. Super. 370 (App. Div. 2023).

| Argued | Decided |
|---|---|
| October 7, 2024 | February 4, 2025 |

Charles L. Becker argued the cause for appellant D.T.
(Kline & Specter, attorneys; Charles L. Becker, David K.
Inscho, Lorraine H. Donnelly, and Ruxandra M.
Laidacker, on the briefs).

Nicholas M. Centrella argued the cause for respondent
Archdiocese of Philadelphia (Clark Hill, attorneys;
Nicholas M. Centrella, on the briefs).

Alex R. Daniel argued the cause for amicus curiae New
Jersey Civil Justice Institute (The New Jersey Civil
Justice Institute, attorneys; Anthony M. Anastasio, of
counsel, and Alex R. Daniel, of counsel and on the brief).

Under Fourteenth Amendment due process principles, a court may exercise specific personal jurisdiction over a nonresident defendant only if there was "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities" in the forum state, "thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). The plaintiff's claims must also "arise out of or relate to the defendant's contacts with the forum" state. Bristol-Myers Squibb Co. v. Superior Ct., 582 U.S. 255, 262 (2017) (alterations and internal quotation omitted). If the court concludes that there are sufficient contacts, it must also find that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'" in order to assert personal jurisdiction over the defendant. Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

This appeal arises from defendant Michael J. McCarthy's alleged sexual abuse of plaintiff D.T. in 1971, when D.T. was fourteen years old. At that time, McCarthy was a priest assigned by defendant the Archdiocese of Philadelphia to live in a Pennsylvania parish operated by the Archdiocese. D.T. and his family attended that parish. D.T. asserts that McCarthy, charged

2

by the Archdiocese to mentor and counsel parish families, exploited his authority as a priest to gain the trust of D.T.'s widowed mother, thereby securing the mother's permission to take D.T. on an overnight trip to a private home in New Jersey. He contends that McCarthy sexually assaulted him during that trip.

D.T. does not suggest that the Archdiocese directed McCarthy to take him to New Jersey or that the trip involved any religious activities or had any spiritual purpose. Instead, D.T. premises his argument that New Jersey has specific jurisdiction over the Archdiocese on its assignment of McCarthy to D.T.'s parish and its expectation that its priests would counsel and mentor parish families. D.T. contends that by conferring on McCarthy the status of a priest in his parish, the Archdiocese facilitated McCarthy's alleged sexual assault of D.T. in New Jersey.

After jurisdictional discovery, the trial court granted the Archdiocese's motion to dismiss the complaint for lack of personal jurisdiction. The Appellate Division granted leave to appeal and affirmed the trial court's determination. D.T. v. Archdiocese of Phila., 477 N.J. Super. 370, 381-89 (App. Div. 2023). We granted leave to appeal.

The conduct that D.T. alleges -- a priest's exploitation of his clerical role to sexually abuse a minor -- is reprehensible. The sole issue before the Court,

3

however, is whether our courts may exercise personal jurisdiction over the Archdiocese in the setting of this case. We agree with the trial court and the Appellate Division that the record does not support D.T.'s contention that the Archdiocese purposefully availed itself of the privilege of conducting activities in New Jersey and that this action arose from or relates to the Archdiocese's contacts with New Jersey. Accordingly, we affirm the Appellate Division's judgment.

I.

A.

We summarize the facts based on D.T.'s complaint and the record that the parties developed during jurisdictional discovery.

The Archdiocese is a diocese of the Roman Catholic Church. It maintains its principal office in Philadelphia and operates parishes, schools, and other facilities in five counties located in Pennsylvania. During jurisdictional discovery, the Archdiocese represented that it previously owned homes in Ventnor and other property in New Jersey but that it neither owns property nor conducts business in New Jersey today.

The Archdiocese's designated witness for jurisdictional discovery, Monsignor Daniel J. Kutys, testified that priests in the Archdiocese are supervised by the Archbishop of Philadelphia, who determines where they live

4

and work. He stated that priests have a responsibility to live a "holy life" and act as an example "by virtue and deeds."

According to Kutys, in the 1970s, priests visited families at their homes, taught people intending to convert to Catholicism, consoled the grieving families of recently deceased parishioners, and mentored young people. He stated that those activities were not specifically directed by the Archdiocese, but were generally viewed as part of the ministry of a priest. Kutys testified that in the 1970s, priests had positions of trust among their parishioners, who generally considered them "men of God."

Kutys testified that, over the years, Archdiocese priests have sometimes accompanied parishioners traveling outside of the geographical boundaries of the Archdiocese. He cited, as examples of such travel, attendance at a canonization ceremony in Rome, trips to World Youth Day, and camping trips sponsored by the Archdiocese.

Kutys testified that the Archdiocese's priests take no vow of poverty and are permitted to own and rent homes, invite visitors to those homes, own cars, and take vacations. He stated that if a priest took a trip that had "a specific spiritual purpose," it would be part of the priest's ministry, but that a trip with no such purpose would be considered vacation.

Kutys stated that priests assigned to be resident priests at a parish -- a title distinct from that of a pastor or assistant pastor -- had limited responsibilities such as conducting one mass per week or filling in for a vacationing pastor. He added that if a resident priest in a parish was assigned to teach in a school, that assignment would be his primary responsibility.

McCarthy was ordained as a priest in 1965. During the decade that followed, he was assigned to be a resident priest at St. Bernadette of Lourdes Parish in Drexel Hill, Pennsylvania, and to teach at Cardinal O'Hara High School in Springfield, Pennsylvania. McCarthy testified that when he lived at the parish, his primary responsibility was to teach at the high school, but he would work at the parish on holidays and weekends.

McCarthy testified that he counseled families in the parish in his capacity as a priest, sometimes at the request of the church's pastor, and conducted funerals and weddings. Asked whether he attempted to be "a role model for the youth" as part of his job at the parish, McCarthy stated, "I did, but I didn't have to." According to McCarthy, he was required to follow the directions of the Archbishop, other bishops, and St. Bernadette's pastor.

McCarthy testified that for decades, his family vacationed in the shore community of Margate, where two of his relatives owned homes. He stated that he occasionally visited those relatives in Margate. He testified that he

6

bought a home in Margate in May or June 1973, and that he, his mother, and various guests stayed at his home. He stated that he never rented a home in Margate.

D.T., now a resident of Illinois, was born in 1957. He testified at his deposition that his mother was a devout Catholic, that he, his parents, and his sister were parishioners at St. Bernadette's, and that he was an altar server from fifth grade to eighth grade. He did not attend Cardinal O'Hara High School.

D.T. stated that in the late 1960s, his father decided to convert to Catholicism and that McCarthy instructed D.T.'s father on Catholic doctrine in preparation for his conversion. He testified that McCarthy had dinner at his family's home at least once a month and was a family friend "more from a parochial counselor standpoint." D.T. recalled that his parents planned to renew their marriage vows on their twenty-fifth anniversary, and that his father's baptism was scheduled to take place in the same ceremony. He said that his father died suddenly of a heart attack shortly before the scheduled date of the ceremony.

D.T. testified that in the wake of his father's death, McCarthy urged his mother to let him serve as a mentor to the boy, and that his mother trusted McCarthy because he was a priest. According to D.T., McCarthy suggested to

his mother that he take D.T. to the shore, and because of her regard for him, she "thought it was a good idea." D.T. stated that the fact that McCarthy was a priest in his parish who was mentoring his family "absolutely" played a role in his mother's decision to allow him to go to the shore with McCarthy.

D.T. testified that on a Friday afternoon during the summer of 1971, McCarthy picked him up at his home in Pennsylvania for the trip to Margate. He stated that McCarthy drove him to a home in Margate, which he understood to be owned by either McCarthy or McCarthy's mother. He stated that early in the trip, McCarthy made suggestive comments and attempted to fondle his chest. D.T. testified that at the house, McCarthy gave him access to pornography and offered him alcohol.

D.T. alleges that McCarthy insisted that they sleep naked in the same bed, and that after they went to bed, McCarthy sexually assaulted him for several minutes. He testified that he terminated the assault by getting out of bed, putting his shorts on, and remaining awake with "one foot on the ground the whole night." D.T. stated that the next day, he told McCarthy that he wanted to leave that day rather than remain in Margate for the rest of the weekend, and McCarthy agreed to drive him home. D.T. testified that as they drove back to Pennsylvania, McCarthy said "that he'd look out for [D.T.] and

8

not to worry about anything that happened," and that he did not respond to that comment.

D.T. stated that after the trip to Margate, he made sure that he was never again alone with McCarthy. He testified that he did not tell anyone about McCarthy's sexual abuse for more than thirty years.[1]

At his deposition, McCarthy admitted that he was a friend of D.T.'s family and testified that he spent time with D.T.'s mother after D.T.'s father's death. He denied taking D.T. to Margate and denied sexually assaulting him.

According to McCarthy, he did not have to ask the Archdiocese's permission before going to Margate. Asked whether he told the Archdiocese about his plans to go to Margate, he testified that he might or might not have, but he was not required to do so. As to whether he had an obligation to notify the Archdiocese that he was taking children of family friends to Margate, McCarthy explained that the Archdiocese "never stopped us from going as priests back and forth. We didn't especially ask for permission there."[2]

---

[1] D.T. alleged in his complaint and in an affidavit that after the Margate incident, McCarthy sexually abused him during visits to his Pennsylvania home in the months that followed the Margate incident. At his deposition, however, D.T. testified that McCarthy did not sexually abuse him on any occasion other than on the trip to Margate in July 1971.

[2] At his deposition, McCarthy admitted to having taken six or seven Cardinal O'Hara High School students on overnight trips to the Margate house that he

9

D.T. does not contend that the Archdiocese knew, prior to his allegations in this matter, that McCarthy took him to Margate in 1971 and sexually assaulted him. He alleges that the Archdiocese was on notice of McCarthy's sexual abuse of minors no later than 1986, when the parent of a student at Cardinal O'Hara High School reported that McCarthy touched her son's buttocks. D.T. also contends that in 1991, a former student at Cardinal O'Hara High School contacted the Archdiocese to state allegations that McCarthy had sexually abused him and several other students at his home in Margate. D.T. alleges that the Archdiocese ignored or concealed other minors' allegations of sexual abuse by McCarthy for several years and that, in 1992, the Archdiocese appointed McCarthy to be the pastor of an Archdiocese parish despite those allegations.

In 1993, McCarthy resigned from his position as pastor and was admitted to a treatment facility. In 1994, the Archdiocese placed McCarthy on administrative leave. It removed him from the priesthood in 2006.

---

bought in 1973 but denied that he sexually assaulted any students during those trips. He stated that the pastor at his church "knew where I was going almost any time I was in and out" and "had no problems with me taking anybody around that I know of." He testified that other teachers and administrators at the high school knew that he would "take kids to the shore overnight."

10

B.

On May 13, 2019, the Legislature enacted the New Jersey Child Victims Act, L. 2019, c. 120.  For a two-year period beginning on December 1, 2019, the Act reopened the statute of limitations for certain time-barred civil claims arising from sexual offenses committed against minors.  See N.J.S.A. 2A:14-2b.

On May 12, 2020, D.T. filed this action against the Archdiocese and McCarthy.  In his complaint, D.T. asserted claims against the Archdiocese for negligence, recklessness, negligent supervision, negligent hiring and supervision, and vicarious liability, and a claim against McCarthy for assault and battery.

Pursuant to Rule 4:6-2(b), the Archdiocese moved to dismiss D.T.'s complaint for lack of personal jurisdiction.  D.T. requested jurisdictional discovery.  The trial court granted the Archdiocese's motion to dismiss and denied D.T.'s request for jurisdictional discovery.  The Appellate Division granted D.T.'s motion for leave to appeal, summarily vacated the trial court's order, and remanded for jurisdictional discovery.  We denied leave to appeal.

Following jurisdictional discovery, the Archdiocese renewed its motion to dismiss D.T.'s complaint and also moved to dismiss McCarthy's cross-claim against it for lack of personal jurisdiction.  The trial court granted both

11

motions and dismissed with prejudice all claims against the Archdiocese. It found that "the New Jersey trip, and the alleged misconduct by McCarthy was not the choice of the Archdiocese," and that the Archdiocese had not "purposefully avail[ed] itself of the privilege of conducting any activities in New Jersey." D.T. moved for leave to appeal.

The Appellate Division again granted leave to appeal. The appellate court reversed the trial court's judgment and remanded the matter to the trial court, ordering the court to reconsider its decision on a fully developed record and to address "whether the Archdiocese's past ownership of property in New Jersey, during relevant time periods, shows that [it] purposefully availed itself of the privilege of conducting activities with New Jersey." The Appellate Division denied the Archdiocese's motion for reconsideration. We denied leave to appeal.

After jurisdictional discovery focusing on the Archdiocese's former ownership of New Jersey properties, the Archdiocese renewed its motion to dismiss. The trial court stated that the Archdiocese's past ownership of property in New Jersey did not alter its "previous analytical approach and decision." It held that the Archdiocese had not purposefully availed itself of the privilege of conducting activities in New Jersey by owning property. The

12

court granted the Archdiocese's motion to dismiss the complaint for lack of personal jurisdiction.

D.T. moved for leave to appeal. The Appellate Division granted leave to appeal and considered the expanded record developed on remand.

The Appellate Division found no evidence that the Archdiocese's former ownership of properties in New Jersey "had any relation to plaintiff's allegation of abuse by McCarthy" and accordingly ruled that those properties provided no basis for personal jurisdiction. D.T., 477 N.J. Super. at 384-85. Noting the parties' agreement that "the Archdiocese was first on notice of McCarthy's propensity to sexually abuse young boys in 1986," the appellate court found "no evidence that the Archdiocese knew of, approved, or sanctioned McCarthy taking [D.T.] to a private home in Margate." Id. at 385. The Appellate Division rejected D.T's contention that personal jurisdiction could be premised on an agency theory based on D.T.'s allegation that the Archdiocese "employed and controlled" McCarthy, who "counsel[ed] and minister[ed] to" D.T. on the Margate trip. Ibid. It held that "McCarthy was not acting within the scope of his responsibilities as a priest when he sexually assaulted" D.T. Id. at 387. The Appellate Division affirmed the trial court's grant of the Archdiocese's motion to dismiss. Id. at 389.

We granted D.T.'s motion for leave to appeal, 257 N.J. 5 (2024), and the motion of the New Jersey Civil Justice Institute to participate as amicus curiae.

II.

A.

D.T. contends that New Jersey has specific jurisdiction over the Archdiocese because McCarthy provided mentorship and counseling services to D.T. and his family, and his status as a priest enabled him to take D.T. to New Jersey and sexually assault him. He argues that the Appellate Division ignored New Jersey agency law when it rejected his personal jurisdiction argument.

B.

The Archdiocese argues that case law addressing agency for purposes of liability does not address the separate question of personal jurisdiction. It contends that it conducted no activities aimed specifically at New Jersey. The Archdiocese states that it neither directed nor suggested McCarthy's trip to his private residence in Margate with D.T. and that McCarthy took that trip for criminal purposes unrelated to any official or religious function.

C.

The New Jersey Civil Justice Institute asserts that personal jurisdiction would have to be predicated on the Archdiocese's purposeful conduct directed

14

toward New Jersey that is related to D.T.'s injury and states there is no evidence that the Archdiocese engaged in any such conduct in this case.

## III.

### A.

The issue of personal jurisdiction "presents 'a mixed question of law and fact' that must be resolved at the outset, 'before the matter may proceed.'" Zahl v. Eastland, 465 N.J. Super. 79, 92 (App. Div. 2020) (quoting Pullen v. Galloway, 461 N.J. Super. 587, 596 (App. Div. 2019)).  An appellate court reviews de novo a trial court's legal determinations regarding personal jurisdiction, but its review of a trial "'court's factual findings with respect to jurisdiction'" is limited to determining whether "those findings are supported by substantial, credible evidence in the record." Rippon v. Smigel, 449 N.J. Super. 344, 358 (App. Div. 2017) (quoting Mastondrea v. Occidental Hotels Mgmt. S.A., 391 N.J. Super. 261, 268 (App. Div. 2007)).

### B.

### 1.

Rule 4:4-4(b)(1) authorizes a New Jersey court to exercise in personam jurisdiction by substituted service outside the State under specified conditions, "consistent with due process of law."  That Rule "effects the so-called long-arm jurisdiction of the State and has been construed as vesting New Jersey's

courts with jurisdiction over non-residents to the outer limits permitted by due process." Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 3.1.1 on <u>R.</u> 4:4-4 (2024). "Consequently, 'we will allow out-of-state service to the uttermost limits permitted by the United States Constitution.'" <u>Charles Gendler & Co., Inc. v. Telecom Equip. Corp.</u>, 102 N.J. 460, 469 (1986) (quoting <u>Avdel Corp. v. Mecure</u>, 58 N.J. 264, 268 (1971)).

When a nonresident defendant challenges personal jurisdiction, the plaintiff bears the burden to demonstrate that the exercise of personal jurisdiction over that defendant would comport with due process principles. <u>Blakey v. Cont'l Airlines, Inc.</u>, 164 N.J. 38, 71 (2000); <u>Rippon</u>, 449 N.J. Super. at 360; <u>Jacobs v. Walt Disney World Co.</u>, 309 N.J. Super. 443, 454 (App. Div. 1998).

### 2.

New Jersey courts determining questions of personal jurisdiction look for guidance to the United States Supreme Court jurisprudence applying Fourteenth Amendment due process principles. <u>Katz v. Katz</u>, 310 N.J. Super. 25, 31 (App. Div. 1998); <u>Jaworowski v. Kube</u>, 276 N.J. Super. 474, 478 (App. Div. 1994).

The Supreme Court has recognized two forms of personal jurisdiction over nonresident defendants: general jurisdiction and specific jurisdiction.

16

Daimler AG v. Bauman, 571 U.S. 117, 127 (2014); Lebel v. Everglades

Marina, Inc., 115 N.J. 317, 322 (1989).

General jurisdiction requires that the defendant's "affiliations with the

State" be "so 'continuous and systematic' as to render" the defendant

"essentially at home in the forum State." Goodyear Dunlop Tires Operations,

S.A. v. Brown, 564 U.S. 915, 919 (2011) (quoting Int'l Shoe, 326 U.S. at 317);

see also Lebel, 115 N.J. at 323 (stating the test for general jurisdiction). Here,

D.T. does not assert that New Jersey may exercise general jurisdiction over the

Archdiocese.[3]

Specific jurisdiction "covers defendants less intimately connected with a

State, but only as to a narrower class of claims." Ford Motor Co. v. Mont.

Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021). As the Supreme Court

observed, its

> decision in International Shoe founded specific
> jurisdiction on an idea of reciprocity between a
> defendant and a State: When (but only when) a
> company "exercises the privilege of conducting
> activities within a state" -- thus "enjoy[ing] the benefits
> and protection of [its] laws" -- the State may hold the
> company to account for related misconduct.

---

[3] McCarthy argued before the trial court that the Archdiocese was subject to both general and specific jurisdiction. He did not appeal the trial court's ruling that New Jersey has neither general nor specific jurisdiction over the Archdiocese.

[Id. at 360 (alterations in original) (quoting Int'l Shoe, 326 U.S. at 319).]

The minimum contacts required to establish specific "jurisdiction often go by the name 'purposeful availment.'" Id. at 359 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). The defendant "must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" Ibid. (quoting Hanson, 357 U.S. at 253). The defendant's contacts with the forum state "must show that the defendant deliberately 'reached out beyond' its home -- by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." Ibid. (alteration in original) (quoting Walden v. Fiore, 571 U.S. 277, 285 (2014)). The contacts must derive "from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." Lebel, 115 N.J. at 323 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98 (1980)); see also Keeton v. Hustler Mag., Inc., 465 U.S. 770, 774 (1984) (holding that the forum state properly exercised personal jurisdiction over the nonresident defendant whose "regular monthly sales of thousands of magazines" could not "by any stretch of the imagination be characterized as random, isolated, or fortuitous").

A court's determination that the nonresident defendant has purposefully availed itself of the forum state does not end the inquiry; "even then -- because

18

the defendant is not 'at home' -- the forum State may exercise jurisdiction in only certain cases." Ford Motor Co., 592 U.S. at 359. Notably, "[t]he plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." Ibid. (quoting Bristol-Myers, 582 U.S. at 262).

The Supreme Court's use of the term "relate to" in that standard "contemplates that some relationships will support jurisdiction without a causal showing," but "[t]hat does not mean anything goes. In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." Id. at 362. There must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Bristol-Myers, 582 U.S. at 262 (quoting Goodyear, 564 U.S. at 919).

To guide courts in determining whether a nonresident defendant's minimum contacts with the forum state are sufficient so that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice," Int'l Shoe, 326 U.S. at 316, the Supreme Court has enumerated several factors. "A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." Asahi Metal Indus. Co. v. Superior Ct. of Cal., 480 U.S. 102, 113 (1987). "It

must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.'" Ibid. (quoting World-Wide Volkswagen, 444 U.S. at 292).

As we have observed, the Supreme Court's cases identify as the core question in a specific jurisdiction case "whether 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" Lebel, 115 N.J. at 324 (quoting World-Wide Volkswagen, 444 U.S. at 297). Consistent with that standard, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." World-Wide Volkswagen, 444 U.S. at 295; accord Lebel, 115 N.J. at 324 ("[T]he mere foreseeability of an event in another state is 'not a "sufficient benchmark" for exercising personal jurisdiction.'" (quoting Burger King, 471 U.S. at 474)). As the United States Supreme Court has explained, its jurisprudence rejects jurisdictional rules "based on general notions of fairness and foreseeability" as "inconsistent with the premises of lawful judicial power" and instead "make[s] clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 883 (2011).

Accordingly, "the minimum contacts inquiry must focus on 'the relationship among the defendant, the forum, and the litigation.'" Lebel, 115 N.J. at 323 (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).

C.

Applying those principles, we consider D.T.'s claim that New Jersey has specific jurisdiction over the Archdiocese in the setting of this appeal.

Before this Court, D.T. abandons his argument, rejected by the Appellate Division, that the Archdiocese's former ownership of properties in New Jersey confers specific jurisdiction. See D.T., 477 N.J. Super. at 384-85. At this stage of the appeal, it is undisputed that the properties owned by the Archdiocese played no role in the sexual assault alleged by D.T. and have no bearing on the jurisdictional inquiry.

Instead, D.T. relies on the Archdiocese's authority over McCarthy's work as a priest, particularly its direction to McCarthy to live in a Pennsylvania parish, mentoring and counseling parish families. He contends that because McCarthy's status as a priest facilitated his alleged sexual assault of D.T. in New Jersey, McCarthy was the Archdiocese's agent when he traveled to New Jersey, and the Archdiocese is subject to specific jurisdiction in New Jersey courts. In support of his argument, D.T. relies on our opinions in Abbamont v. Piscataway Township Board of Education, 138 N.J. 405, 416-

21

19 (1994), and <u>Hardwicke v. American Boychoir School</u>, 188 N.J. 69, 101-02 (2006), in which we stated agency principles governing whether an employer should be subject to vicarious liability for the tortious conduct of its employee in certain circumstances.[4] We did not address the question of personal jurisdiction in those decisions.

The United States Supreme Court has recognized that agency principles may play a role in the determination whether a nonresident defendant is subject to specific jurisdiction. In <u>Daimler</u>, the Court considered whether general jurisdiction over a foreign corporation can be premised on the contacts between a proposed forum state and a subsidiary in that state. 571 U.S. at 134-36. The Court noted its recognition in prior decisions that "[a]gency

---

[4] In <u>Abbamont</u> and <u>Hardwicke</u>, we applied vicarious liability principles stated in the sexual harassment setting of <u>Lehmann v. Toys "R" Us, Inc.</u>, 132 N.J. 587, 619-25 (1993). <u>See</u> <u>Hardwicke</u>, 188 N.J. at 100-03 (determining a school's vicarious liability for a teacher's sexual abuse of a student under <u>Lehmann</u>); <u>Abbamont</u>, 138 N.J. at 416-21 (applying the <u>Lehmann</u> test to an action brought under the Conscientious Employee Protection Act (CEPA)). In <u>Abbamont</u>, we held that an employer could be liable for employee conduct that violates CEPA if the challenged action occurs within the scope of the employment -- that is, if the action is of the kind that the employee was hired to perform, "occurs substantially within the authorized time and space limits," and was motivated, "at least in part, by a purpose to serve the" employer. 138 N.J. at 416 (internal quotations omitted). In <u>Hardwicke</u>, we held that employers could be held vicariously liable for the acts of an employee outside of the scope of the employment if the employer delegated the authority to control the work environment to a supervisor and the supervisor abused that delegated authority. 188 N.J. at 101-02.

22

relationships . . . may be relevant to the existence of specific jurisdiction." Id. at 135 n.13 (emphasis omitted). It observed that "a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." Ibid. (citing Asahi, 480 U.S. at 112; Int'l Shoe, 326 U.S. at 318). The Supreme Court thus observed that agency principles sometimes inform a due process analysis in a specific jurisdiction case, citing decisions in which the nonresident defendant's purposeful availment of the forum state included directing its agents or distributors to conduct business in that state. Ibid.; see also Ford Motor Co., 592 U.S. at 365 (finding that the forum states had specific jurisdiction over Ford where -- "[b]y every means imaginable," including advertising and the maintenance of more than a hundred dealerships -- Ford had urged residents of those states "to buy its vehicles").

The Supreme Court did not suggest in Daimler, however, that agency principles governing the question of a principal's liability for the acts of an agent displace the minimum contacts due process analysis in a personal jurisdiction inquiry; instead, it reiterated the minimum contacts standard for specific jurisdiction. 571 U.S. at 132-34. Nor did the Supreme Court conflate questions of personal jurisdiction with the issue of vicarious liability. Ibid. Under the Supreme Court's decisions, New Jersey may not exercise specific jurisdiction over the Archdiocese unless the Archdiocese purposefully availed

23

itself of the privilege of conducting activities in New Jersey, and the claims at issue arose from or related to the Archdiocese's contacts with New Jersey. See Ford Motor Co., 592 U.S. at 359; Burger King, 471 U.S. at 475-76; World-Wide Volkswagen, 444 U.S. at 297-98. Accordingly, if the Archdiocese did not establish minimum contacts with New Jersey that are relevant to this case, either directly or through an agent, agency principles do not support D.T.'s jurisdictional argument.

We concur with the Appellate Division that the Archdiocese did not establish such contacts with New Jersey. There is, of course, evidence in the record that the Archdiocese assigned McCarthy to be a resident priest in St. Bernadette's parish, and that it expected its priests to counsel and mentor parish families. But the Archdiocese's oversight of McCarthy's work as a priest did not give rise to the necessary nexus with New Jersey. When the Archdiocese assigned a Pennsylvania priest to a Pennsylvania parish, instructing that priest to minister to Pennsylvania families, it did not "deliberately 'reach[] out beyond' its home," as a car manufacturer might do by establishing a dealership to market products in another state. See Ford Motor Co., 592 U.S. at 359 (quoting Walden, 571 U.S. at 285). When it assigned McCarthy to D.T.'s parish and directed him to minister to its parishioners, the Archdiocese did not transcend the borders of its home state.

24

If D.T.'s allegations are true, it was McCarthy, not the Archdiocese, who initiated and maintained contacts with New Jersey that are relevant to this case. It was McCarthy, not the Archdiocese, who either owned or had access to the private home in Margate where the sexual abuse allegedly occurred. It was McCarthy, not the Archdiocese, who sought and obtained the permission of D.T.'s mother to take him on an overnight trip. And it was McCarthy, not the Archdiocese, who allegedly drove D.T. to Margate where he sexually assaulted the boy. There is no evidence that any Archdiocese representative was aware of McCarthy's impending trip, let alone that it assigned McCarthy to take D.T. to New Jersey. There is no evidence that McCarthy conducted business on behalf of the Archdiocese in New Jersey, or that the trip entailed any religious or ecclesiastical activities.

To the contrary, if D.T.'s testimony is accurate, McCarthy took him to Margate for one purpose: to have unsupervised access to D.T. and to sexually assault him, for his own gratification.

Accordingly, we view the trial court's factual findings to be grounded in substantial credible evidence in the record, and we agree with the Appellate Division's analysis and conclusion. D.T. has not demonstrated that the Archdiocese's exercise of supervisory authority over McCarthy gave rise to minimum contacts between the Archdiocese and New Jersey that relate to this

25

action. There was no "reciprocity between a defendant and a State," required to exercise specific jurisdiction, in the setting of this appeal. Ford Motor Co., 592 U.S. at 360; see also Int'l Shoe, 326 U.S. at 319.[5]

We do not reach the question whether the exercise of jurisdiction over the Archdiocese would offend "traditional notions of fair play and substantial justice," Int'l Shoe, 326 U.S. at 316, or the Archdiocese's contention that D.T.'s argument that a judicial application of canon law governing its relationship with its priests would violate the First Amendment's religion clauses.

IV.

The judgment of the Appellate Division is affirmed.

---

[5] The Appellate Division's opinion in Doe 70 v. Diocese of Metuchen, 477 N.J. Super. 270, 284-87 (App. Div. 2023), decided on the same day as the Appellate Division's decision in this appeal, arose from a setting very different from the circumstances here. In Doe 70, the Diocese of Richmond, Virginia, encouraged a priest who admitted to sexually abusing two boys to move to New Jersey, and it facilitated that transfer by allowing the priest to remain part of its retirement plan. Id. at 276-78. The appellate court concluded that the Diocese of Richmond purposefully maintained contacts with New Jersey that related to the action; it also found that the exercise of specific jurisdiction over that Diocese comported with fair play and substantial justice. Id. at 284-87. The Appellate Division accordingly asserted personal jurisdiction over the Diocese. Ibid.

26

CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE PATTERSON's opinion.